UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HOMAX PRODUCTS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-08-cv-01560 |
| | § | |
| HOMAX, INC., | § | |
| | § | |
| | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Before the Court are the Motion for Summary Judgment (Doc. No. 33) and

Opposed Motion for Partial Summary Judgment (Doc. No. 36) of Plaintiff Homax

Products Inc. ("Homax Products"). After considering the parties' filings, all responses

and replies thereto, and the applicable law, the Court finds that the Motion for Summary

Judgment should be granted and the Opposed Motion for Partial Summary Judgment

should be denied as moot.[1]

## I.     BACKGROUND

Plaintiff Homax Products sells a host of products for home improvement and

cleaning needs. (Clawson Aff. ¶ 2, May 5, 2009.)[2]  Plaintiff first began operating in 1982

when its founder, Don Stern, developed and began to sell a spray texture gun.  (*Id.*)  It

filed its first trademark registration on April 19, 1982 with the United States Patent and

Trademark Office ("PTO") for the mark "Homax" on hand-operated sprayers.  (Lee Aff.,

---

[1] After inspecting the Docket, the Court found that Document No. 36, which is entitled "Opposed Motion for Partial Summary Judgment" is actually Plaintiff's reply related to an earlier motion.  To remedy this clerical error, the Court will deny the Motion as moot.

[2] The Court gave a cursory explanation of the facts in its Memorandum and Order dated July 17, 2009. (Doc. No. 42.)  Because Plaintiff's Motion for Summary Judgment has a broader scope, the Court now explains the facts in more detail.  For the purposes of this Motion only, the Court presents the facts in the light most favorable to Defendant, the non-moving party.

Ex. A.)  This application became Registration No. 1252169 on September 27, 1983 ("169

Registration").  (*Id.*)  On February 13, 1989, Plaintiff filed an affidavit establishing its

continuous use of the mark for five years and obtained confirmation of compliance with

15 U.S.C. § 1065.  (*Id.* at Ex. B.)  The 169 Registration was assigned to Plaintiff on June

3, 2003, and Plaintiff has since maintained it.  (*Id.* at Exs. C-D.)  Plaintiff filed its second

application for the Homax mark on April 3, 2000, and it was granted on November 5,

2002 under Registration No. 2646529 ("529 Registration").  The range of goods covered

by Registration 529 include products for tile, cleaners for paint and mildew, tests kits,

and spackling and dry wall kits.  (*Id.* at Ex. E.) On October 29, 2008, Homax filed an

affidavit to comply with 15 U.S.C. § 1065.  (*Id.* at Ex. F.)

Plaintiff now sells over 1800 products under a variety of brand names, including

600 products that are marketed under the Homax brand.  All activities, sales, promotion,

customer service, customer relations, and other aspects of Plaintiff's business are

conducted under the name Homax.  (*Id.*)  Under the Homax brand, Plaintiff sells a variety

of products, including Aerosol spray textures, spray texture guns, texture patch products,

roll-on decorative textures, paint additives, wall patches, fiberglass mesh tape, adhesive

spreaders, wall and ceiling spray textures, caulking finishing tools, and bathtub

refinishing materials.  (*Id.* at ¶ 3A.)  Under its Goo Gone, Magic, Oops, and Gonzo

brands, Plaintiff sells specialty removers, specialty cleaners, wipes, spongers, odor

eliminators, and stain removers.  (*Id* at ¶ 3B.)  Under the Jasco and Rhodes American

brands, Plaintiff sells steel wool and wood preservatives floor and tile products.  Under

the Magic and Myro brands, it sells caulk strips, sealers, trims, splash guards, safety

treads, and caulk accessories.  (*Id.* at ¶¶ 3C-3D.)  Finally, under the Krusin, Tile Guard,

Tough Tile, Lead Check, and Welder Brands, Plaintiff sells grout coatings and sealers, high-gloss, heat-resistant appliance touch-up products, porcelain spray finishes, porcelain chip-fix products, all-purpose adhesives, fence-gate assembly kits, lead-test products, and tarp clips. (*Id.* at ¶ 3E.)

The Homax mark is the predominant mark used by Plaintiff. (*Id.*)   Products sold under the Homax brand comprise the majority of total product sales for Plaintiff, or approximately fifty percent of gross sales. (*Id.*) The mark has always been the central brand used to sell Plaintiff's products. (*Id.*)  In 2007, Plaintiff had gross sales of $135,473,000, of which Homax branded goods accounted for $82,665,624. (*Id.* at ¶ 4.) Plaintiff sells the products predominantly through large stores, such as Lowes, Home Depot, and Wal-Mart.  Plaintiff's products are sold in these stores in all fifty states, as well as through Plaintiff's website. (*Id.* at ¶ 5)  In addition, there are hundreds of other chains and independent retail stores that distribute the Homax brand throughout the United States, including Distribution America, K-Mart, Lancaster Schuermann, McMaster Carr Supply Co., Monarch Paint, Orchard Supply Hardware, Pacoa, Pro Group, Tools for Trade, and United Hardware Dist. (*Id.* at ¶ 5.) Plaintiff has used the Homax brand continuously since at least 1993. (*Id.* at ¶¶ 1-4.)

Plaintiff relies primarily on in-store advertising. (*Id.* at ¶ 6.)  It enters into advertising cooperatives with larger stores that charge vendors a fee to be included in store promotions. (*Id.*)  In 2007, Plaintiff spent approximately $3,500,000 on advertising cooperatives for all its products. (*Id.*)  Plaintiff also promotes its products by participating in various tradeshows—approximately ninety shows each year. (*Id.* at ¶ 7.) At the shows, Plaintiff presents its products under their various brand names but also

advertises its booth and products under the umbrella name Homax. (*Id.*) These trade shows are attended by representatives from retail stores. (*Id.*) Plaintiff spends approximately $1,000,000 each year to attend these tradeshows. (*Id.*)

Acquiring other companies and their product lines is part of Plaintiff's strategy to increase its market share. (*Id.* at ¶ 8.) Over the past ten years, Plaintiff has acquired a number of companies and their product lines.[3] (*Id.*) Plaintiff also develops its own new products by upgrading features on existing products in keeping with new technology. (*Id.* at ¶ 9.) Plaintiff typically develops between twenty and fifty new products per year, representing millions of dollars in incremental revenue. (*Id.*)

Plaintiff enjoys a good relationship with its retail customers and the industry. (*Id.* at ¶ 12.) It has received several awards, including the *Professional Builders* magazine "Top Product of 1992" award for plastic drywall tools, 2001 Sherwin-Williams Vendor of the Year, 2002 Do-it-Best Supplier of the Year, 2003 Ace Hardware Domestic Vendor of the Year, 2004 Lowe's Vendor of the Year, and 2005 Do-it-Best Supplier of the Year. (*Id.*) *Do-It Yourself Retailing* magazine also recognized Plaintiff's ceiling texture scraper in its new product showcase. (*Id.*)

Defendant Homax Inc. was founded in 2001. (Shum Dep. 5:20-6:12, Dec. 12, 2008.)   Joseph Shum, the co-founder of the company, and his business partner at the time developed the name Homax because they sold items for the home and were influenced by the name "Office Max." (Shum Dep. 27:12-28:14.) Shum contacted the Texas Secretary of State who confirmed that the name Homax was available for him to

---

[3] Some of these companies include Tile Care Products (acquired in 1998), Rhodes American Products (acquired in 1999), Krusin International (acquired in 2000), Magic American Products (acquired in 2002), Jasco Chemical Corp. (acquired in 2003 and sold in 2008), Bix Manufacturing Corp. (acquired in 2004 and sold in 2008), Stone Care International (acquired in 2005), Site-B Corporation, Black Flag (acquired in 2007), and Walco-Linck Company (acquired in 2008).

use. (Shum Dep. Ex. A, 26-29.) Shum then incorporated Homax. (Shum Dep. 42:23; 137:2-4.) Defendant has used the name since 2001. (*Id.* at 28:20-22.)

Defendant is a wholesale distributor that sells only to retailers. (Shum Dep. 68:1-18; 117-132.) Most of the items it sells are branded by other companies, but some items are sold under Defendant's own Homax brand. (Shum Dep. 32-49.) Defendant estimates that it sells approximately 1,000 products, ten percent of its total product line, under its Homax brand. (*Id.* at 35:9-25.) Defendant's Homax brand has approximately ten to fifteen categories of items, including crafts, artificial flowers, plastic items, such as food containers and buckets, ceramics, such as decorative items and tableware, seasonal decorations and party supplies, toys, stationery, kitchenware, and housewares and homewares. (*Id.* at 36-41.) The houseware and homeware category includes mops, brooms, dust pans, tool boxes, paint holders, nails, screws, hammers, wrenches, paint frames, brushes, and rollers. (*Id.* at 41:17-42:8.) Additionally, Defendant sells power adapters, extension cords, light bulbs, and touch lights under its Homax brand. (*Id.* at 44:16-46:17.)

Defendant has consistently used its version of the Homax logo, which emphasizes the letter "A", since 2001. (*Id.* at 49-50.) Defendant uses the logo on its warehouse sign, letterhead, business cards, contracts, purchase orders, invoice and packing lists, and on its company website. (*Id.* at 51:10-25.) Defendants' customers include various retailers, such as independent dollar store chains (*id.* at 68:2-10); its main customers are grocery stores. (*Id.* at 132:14-20.) Defendant mainly sells to customers who shop at its warehouse, but it does take some orders over the phone. (*Id.* at 52-53.) Most of Defendant's clients are based in Texas (*id.* at 61-62), but it has some current and former

clients in Florida, Louisiana, New Jersey, California, and Oklahoma.  (*Id.* at 138.) Defendant is not currently planning to expand its business outside of Texas or to expand the scope of its business.  (*Id.* at 89:3-12.)  Defendant's sole source of advertising is its website and the sign in front of its warehouse.  (*Id.* at 65:18-21.)  In the past, from 2001-2004, Defendant attended trade shows in Las Vegas, Chicago, and Houston.  (*Id.* at 54-55.)

The items that Defendants sells with the Homax brand are manufactured in China. (*Id.* at 78:6-11.)  Defendant has been using the Homax brand on its housewares and hardware items for approximately six or seven years.  Defendant estimates that eighty to eighty-five percent of its gross profits come from its Homax brand.  (*Id.* at 133:11-14.)

Defendant has never filed for any type of trademark registration.  (*Id.* at 127:15-20.)  Defendant did not become aware of any trademark issues, and was never asked to stop using the Homax name, until Plaintiff first informed it that Defendant's use of the Homax name violated its trademark.  (*Id.* at 28:20-30:13; 100:6-102:3.)

Plaintiff filed suit, alleging claims of trademark infringement in violation of 15 U.S.C. § 1114(1)(a) and false designation pursuant to 15 U.S.C. § 1125(a)(1)(A) and (B). Plaintiff also sought a permanent injunction under the Lanham Act.  Plaintiff now moves for summary judgment.  It requests that the Court find that it has a protected right and interest in the trademark Homax arising from its trademark registrations and independently from its use of the mark and that Defendant's use of the mark infringes on Homax's protectable trademark rights as a matter of law under 15 USC § 1114(1)(a) and USC § 1125(a)(1)(A) and B.  This Court has jurisdiction pursuant to 28 U.S.C. § 1338 and 28 U.S.C. § 1332.

## II.   ANALYSIS

### A.  Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.*  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### B.  Plaintiff's Right to the Homax Trademark

Trademark infringement is established if the plaintiff can show that (1) it has a protectable right in the trademark, and (2) if the defendant's use of the same mark

infringes on the plaintiff's use or is likely to cause confusion. *Security Center, Ltd. v. First Nat. Sec. Centers*, 750 F.2d 1295, 1298 (5th Cir. 1985). Plaintiff asks the Court to find that it satisfies the first element by holding that it has a protected right and interest in the trademark Homax arising from its trademark registrations.

"Any registration ... of a mark registered on the principal register ... and owned by a party to an action ... shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein ...." 15 U.S.C. § 1115(a). Furthermore, when a registrant properly files an affidavit asserting that its registered mark has been in continuous use for five years, pursuant to 15 U.S.C. § 1065, the registrant's use of the mark is considered "incontestable." When a registrant's use of the mark becomes incontestable, "the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b).

Plaintiff has filed affidavits asserting that its use of the 169 Registration and the 529 Registration has been continuous for five years in order to establish its incontestable right to the Homax trademark. (Lee Aff., Ex. B and F.) Defendant does not dispute that Plaintiff's mark is legally protected as to the items listed in the relevant registrations and affidavits. (Def. Resp. ¶ 15.) The Court therefore holds that Plaintiff has a protectable right and interest in the trademark Homax arising from its trademark registrations.

### C. Trademark Infringement

Plaintiff next urges that the Court find, as a matter of law, that Defendant has infringed on Plaintiff's Homax trademark. In a trademark infringement case, the paramount question is whether one mark is likely to cause confusion with another. *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, --- F.3d ---, 2009 WL 2033150, at * 2 (5th Cir. July 15, 2009) (citing *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985)). "Likelihood of confusion" is defined as more than a mere possibility but rather a probability of confusion. *Xtreme*, 2009 WL 2033150 (citing *Bd. of Supervisors for La. State Univ. Agric. & Mech. College* v. *Smack Apparel*, 550 F.3d 465, 478 (5th Cir. 2008)). The Fifth Circuit examines nonexhaustive "digits of confusion" to determine likelihood of confusion: (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identify; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers. *Id.* No digit is dispositive, and the digits may weigh differently from case to case, "depending on the particular facts and circumstances involved." *Xtreme Lashes*, 2009 WL 2033150 at *2 (citing *Marathon*, 767 F.2d at 218). "While likelihood of confusion is typically a question of fact, summary judgment is proper if the 'record compels the conclusion that the movant is entitled to judgment as a matter of law.'" *Id.* (citing *Smack Apparel*, 550 F.3d at 474). To determine whether consumers are likely to confuse products sold by Plaintiff and Defendant, the Court applies the eight digits of confusion to the facts.

### 1. Type of Trademark

"Type of trademark refers to the strength of the senior mark; stronger marks are entitled to greater protection." *Xtreme Lashes*, 2009 WL 2033150 at *2 (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998); *Amstar Corp. v. Dominos' Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir. 1980)). Marks are assigned to "categories of increasing distinctiveness": (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Id.* (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). "The later three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Id.* (quotations omitted). The Fifth Circuit has defined the first three categories, and the relative level of protection they merit:

> A generic term refers to the class of which a good is a member. A descriptive term provides an attribute or quality of a good. Generic terms receive no trademark protection, while descriptive terms merit protection only if they have secondary meaning. A suggestive term suggests, but does not describe, an attribute of the good; it requires the consumer to exercise his imagination to apply the trademark to the good.

*Xtreme Lashes*, 2009 WL 2033150 at *2 (internal citations omitted). More distinctiveness and less natural or literal context correspond with increased mark strength. *Id.* (citation omitted). "Any given term's correct classification is a factual issue." *Id.* (citing *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 n. 12 (5th Cir. 1980)). Plaintiff argues that, because Homax is a coined term, it is fanciful and therefore warrants the highest level of protection.

Arbitrary or fanciful terms are marks that "bear no relationship to the products or services to which they are applied." *Sun Water Systems, Inc. v. Vitasalus, Inc.*, No. 4:05-CV-574-Y, 2007 WL 628099, at *14 (N.D.Tex. Feb. 28, 2007) (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 768, 791 (5th Cir. 1983)). Fanciful terms are

coined or made-up words such as "Xerox," or "Kodak." *Id.* The Court agrees with Plaintiff that Homax is a fanciful word—it does not appear in the dictionary and does not have a common meaning in the English language. The term is therefore entitled to protection.

Further, Plaintiff argues that Homax is a strong mark because of its predominance in the marketplace. "The ultimate strength of the mark, the key inquiry before us, is determined by a number of factors which establish its standing in the marketplace. *Sun Banks of Florida, Inc. v. Sun Federal Sav. and Loan Ass'n,* 651 F.2d 311, 315 (5th Cir. 1981). "Marks may be strengthened [in the marketplace] by extensive advertising, length of time in business, public recognition, and uniqueness." *Quantum Fitness Corporation v. Quantum Lifestyle Center, LLC,* 83 F.Supp.2d 810, 820 (S.D.Tex. 1999) (quoting *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir.1988)). Plaintiff has introduced evidence indicating that it spends several million dollars on advertising for its products each year, it has been using the Homax brand since 1982, it has the largest market share for texture spray-on products, and its Homax branded products generated $82 million in gross sales for 2007. Defendant does not controvert Plaintiff's evidence, and it establishes that Homax has a relatively strong position in the marketplace.

Defendant argues, however, that Plaintiff's evidence is insufficient because it does not include consumer surveys on recognition of the Homax brand and because several third parties use the name "Homax." In *Bose Corporation v. QSC Audio Properties, Inc.,* the Federal Circuit recognized:

> Direct evidence of fame, for example from widespread consumer polls, rarely appears in contests over likelihood of confusion. Instead, our cases teach that the fame of a mark may be measured indirectly, among other things, by the volume of

sales and advertising expenditures of the goods traveling under the mark, and by the length of time those indicia of commercial awareness have been evident.

293 F.3d 1367, 1371 (Fed. Cir. 2002) (collecting cases). Indeed, Defendant has cited no case in which a court required the plaintiff to submit direct evidence from consumers to establish its mark's fame. Other courts in this district have relied on evidence of advertising expenses, promotional activities, and industry reviews to prove strength of the mark. *See Quantum Fitness Center*, 83 F.Supp.2d at 820. In the instant case, Plaintiff has introduced sufficient evidence of advertising, gross sales, and market share to indicate that its Homax mark is strong within the home repair market and thus entitled to a higher level of protection.

Defendant's second argument is that the term Homax is widely used by third parties. Third-party usage of similar marks is another factor which determines the strength of a mark in the marketplace. *Id.* (citations omitted). The Fifth Circuit considers evidence of third-party usage of a mark on unrelated good and services in assessing the mark's strength in the marketplace. *Quantum*, 83 F.Supp.2d at 820 (citations omitted). "While the Fifth Circuit requires a broad examination of the marketplace, it also recognizes that extensive third-party usage may weaken a mark but does not in itself eliminate a mark's protectability in all cases." *Id.* Third-party usage may limit the scope of protection for a mark when the mark is used for purposes "outside the uses to which plaintiff has already put its mark." *Id.* (quoting *Amstar*, 615 F.2d at 259).

Robert Franks, Defendant's expert on trademark infringement, conducted a search on Dialog File 515, Dun's Electronic Business Directory, on April 12, 2009, and found 27 companies whose name contains the word "Homax." (Franks Aff. ¶ 1 and 7.) Of these 27 businesses, one of which is Defendant and two of which appear to be Plaintiff,

only one, Homax Tile, engages in business that is similar to that of Plaintiff.[4]   Defendant has also searched databases from various states to find corporations using the name Homax; Plaintiff points out that, of the thirty companies Defendant found, six are "live" corporations. (Def. Resp., Ex. 1-B and 1-C.) The Court is unable to determine, based on the corporate registrations, whether these companies engage in business similar to that of Plaintiff.  Defendant has therefore demonstrated that, nationwide, there are seven third-party companies using the name "Homax," one of which has business that possibly overlaps with that of Plaintiff.  This evidence suggests that Plaintiff's mark is slightly weaker in the overall marketplace; however, it is still sufficiently strong in the home improvement market to create a likelihood of confusion if a junior user, like Defendant, uses a similar mark in the same industry.

### 2.  Mark Similarity

Mark similarity is "determined by comparing the marks' appearance, sound, and meaning." *Xtreme Lashes*, 2009 WL 2033150 at *3 (citing *Elvis Presley Enterprises, Inc. v. Capece,* 141 F.3d 188, 201 (5th Cir. 1998)) "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." *Id.* (quoting *Amstar*, 615 F.2d at 260-261).   Courts should, however, pay attention to the mark's dominant features.  *Xtreme Lashes*, 2009 WL 2033150 at *3. "Even if two marks are distinguishable, [the factfinder asks] whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." *Id.* To determine

---

[4] It is possible that Homax Tile is actually part of the same entity as Plaintiff, since the company's address refers to "Homax Products" and, like Plaintiff, it is based in Washington state.  Plaintiff does not make this argument, however, and the company has a different address and phone number from Plaintiff.  The Court will therefore consider it a separate entity.

the meaning and connotation of the mark, the court considers the context of use, such as labels, packaging, and advertising. *Id*. "The two marks must bear some threshold resemblance in order to trigger inquiry into extrinsic factors, but this threshold is considerably lower than the degree of similarity required where the plaintiff presents little or no evidence on extrinsic factors supporting infringement." *Id*. (citing *Sun-Fun*, 656 F.2d at 189).

Both companies are essentially called Homax: Plaintiff is Homax Products, Inc. and Defendant is Homax, Inc. The two parties each use a mark that features the word "Homax." (Pl. Reply, Appendix A.) Plaintiff's mark features white or light block lettering placed over a black or dark pentagon that resembles a building with a roof. (*Id*.) The character "H" is capitalized; the rest of the letters are lowercase. The final letter "X" is composed of two lines of unequal length. Defendant's mark features a different font from that of Plaintiff's. The word Homax is placed over a dark rectangular background and features dark font embossed with a light or white color. (*Id*.) All the letters are capitalized and of the same height, except for the "A" which is larger than the other characters. The "A" also appears to be a different shade than the other characters. There are two lines running behind the word Homax in Defendant's mark. (*Id*.)

Plaintiff argues that the two marks are virtually "identical" and downplays the minor differences between them. Further, it contends that the difference in the two companies' names is insignificant because, in both, the word Homax predominates. Defendant argues that the overall impression of the two marks is not similar on either the parties' packaging or their websites. Defendant also asserts that the parties have different advertising and customer bases. Finally, Defendant points to the lack of evidence in the

14

form of customer surveys or testimony indicating that the marks are confusingly similar. Plaintiff replies that the overall impression of the two marks is similar because they use the same word and each overemphasizes one letter "through elongation downwards on one side."

The Court believes that there is a fact issue as to whether, given the context of the mark's use on labels, packaging, and advertising, they are confusingly similar. Plaintiff's analysis of the similarity in the marks' shape and presentation is not conclusive. A focus on the marks' distinguishable visual features, when viewed "side by side in the judicial solemnity of the courtroom is by itself enough of a falsification of actual market conditions to defy realistic appraisal." *Xtreme Lashes*, 2009 WL 2033150, at *3 (citations omitted). The parties have attached some photos of the marks used on packaging and advertising; however, considering the facts in the light most favorable to Defendant, a reasonably jury could determine that the marks are not likely to cause confusion. While it is true that both marks feature the word "Homax," the font, color, and presentation of the word are quite different. Thus, the Court cannot find, as a matter of law, that the Defendant's mark is so similar to Plaintiff's that it is likely to confuse buyers.

### 3. Product Similarity

Both companies carry a wide variety of products under their respective Homax brands. Plaintiff uses the brand to market products for home repair, improvement, and cleaning, such as painting supplies, specialty cleaners, steel wool, grout coating, spray finishes, and adhesives. Defendant sells a wide assortment of goods under the mark, from seasonal decorations to stationery. Notably, it also sells home improvement

products under its version of the mark, including mops, brooms, dust pans, tool boxes, paint holders, nails, screws, hammers, wrenches, paint frames, brushes and rollers, as well as extension cords, light bulbs, and touch lights. Plaintiff contends that the products are sufficiently similar, as a matter of law, for the Court to find a likelihood of confusion.

"The greater the similarity between the products and the services, the greater the likelihood of confusion." *Xtreme Lashes*, 2009 WL 2033150, at *4 (citing *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980)). Direct competition, however, is not required in order to find a likelihood of confusion. *Westchester Media v. PRL USA Holdings*, 214 F.3d 658, 666 (5th Cir. 2000) (citing *Elvis Presley Enters.*, 141 F.3d at 202). "[E]ven if the goods in question are different from, and thus not related to, one another in kind, the same goods can be related in the mind of the consuming public as to the origin of the goods." *Recot, Inc. v. M.C. Benton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000). If products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection. *Westchester*, 214 F.3d at 666. "[W]hen the sponsor or maker or one business or product might naturally be assumed to be the maker or sponsor of another business product ... the deceived customer buys the infringer's product in the belief that it originates with the trademark owner or that it is in some way affiliated with the owner." *Garden & Gun, LLC v. Twodalgals, LLC*, No. 3:08-cv-349, 2008 WL 3925276, at *5 (W.D.N.C. Aug. 21, 2008) (quoting *Elvis Presley Enterprises, Inc.*, 141 F.3d at 202).

The danger of affiliation or sponsorship confusion increases when the junior user's market is one into which the senior user would naturally expand. *Id.* The actual intent of the senior user to expand is not particularly probative. *Id.* (citing *Elvis Presley*

*Enters.*, 141 F.3d at 202).  Consumer perception is the controlling factor: "[i]f consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely." *Id.* (internal quotations and citations omitted).

The Fifth Circuit has found in a number of cases that non-competing products are still similar enough to lead to a likelihood of confusion.  *See Westchester*, 214 F.3d at 666-667 (holding that New Polo Magazine, which emphasized fashion, elegance, and affluent lifestyle, was likely to be erroneously associated with Polo Ralph Lauren because both appealed to the same group of consumers and were marketed in the same channels); *Recot*, 214 F.3d at 1328-1329 (finding that consumers would likely affiliate Fido Lay dog treats with Frito-Lay human snacks because several witnesses testified that many companies produce both human and pet food and because Frito-Lay had recently promoted its products in association with the movie "101 Dalmatians"); *Turner v. HMH Pub. Co.,* 380 F.2d 224 (5th Cir. 1967), *cert. denied* 389 U.S. 1006 (1967) (concluding that a nightclub called "Playboy" could not avoid confusion with Playboy magazine where the parent company of magazine also owned "Playboy Clubs" nightclubs; thus, consumers would assume a sponsorship).  In the instant case, it appears that the parties both market some overlapping or similar products under the Homax brand.  Given the similarity of Defendant's housewares products with Plaintiff's product line, and Plaintiff's rapid expansion of its product line in the past ten years, consumers could likely assume that Defendant's products are affiliated with Plaintiff.

Defendant responds that its products do not compete with Plaintiff's, and that, to the extent the products might compete, consumers are not likely to mistake one brand for the other. Defendant points to the fact that it has very few Homax branded items and that Plaintiff has no actual Homax store. Shum testified, however, that Defendant markets close to one thousand products under its Homax brand, and he identified several houseware items that are similar to Plaintiff's products. The fact that Plaintiff does not have a store is not probative because consumers tend to purchase both parties' products in third-party retail stores and grocery stores. Finally, Defendant cites *Amstar Corp. v. Domino Pizza, Inc.*, for the proposition that, when parties are not competitors, the showing of a likelihood of confusion is more difficult. 615 F.2d at 262. In that case, the Sixth Circuit found that the plaintiff's Domino sugar packets were not sufficiently similar to the defendant's Domino pizza to create a likelihood of confusion because the products were sold in different outlets, namely grocery stores as opposed to fast food stores. The products at issue, and the retail locations, are much more similar in the instant case. This factor therefore weighs in favor of a likelihood of confusion.

### 4. Outlet and Purchaser Identity

Plaintiff argues that both parties have similar distribution networks and end customers, which increases the likelihood of confusion. Both companies are wholesale distributors of products that are sold through retail stores. The parties have at least three current and former retail customers in common: Brookshire Brothers, Kroger, and H.E.B. (Shum Dep. 36, 64-66 and 117; Clawson Aff. ¶ 10.) Plaintiff argues that there is potential for overlap because of the absolute supply of retail chains and the similar nature of the parties. Defendant's principal retail customers are grocery stores and dollar stores,

18

and Plaintiff asserts that grocery stores are progressively introducing "do-it-yourself" products and that this market is a particular target for Plaintiff's Homax brand.

Next, Plaintiff contends that, even if there is no commonality between the stores where the products are sold, there is still a strong similarity between the predominant consumers of the goods.  To support this claim, Plaintiff presents the evidence of Gabe Gelb, a Houston-based marketing and branding researcher.  (Gelb Aff. ¶ 1.)  Gelb, citing reports by Scarborough Research and AC Nielsen, posits that it is more probable than not that Wal-Mart customers are also dollar store customers.  (*Id.* at ¶¶ 3-4.)  Because Wal-Mart is one of Plaintiff's largest retailers, and Defendant targets dollar stores, Plaintiff argue that there is a strong overlap in the type of customer purchasing the parties' products.

Defendant counters that Plaintiff sells its products to retailers like Home Depot, Lowe's, Ace Hardware, and Wal-Mart, and does not operate its own retail store where consumers could purchase Homax branded items.  Defendant attempts to differentiate its business model, arguing that it has clients such as Fiesta and the Dollar Store, and that it operates a showroom where it primarily sells items branded by other companies. Defendant further argues that "sophisticated vendors" would not confuse the two brands. Finally, Defendant objects to Plaintiff's contention that it might, at some point in the future, compete with Defendant in grocery stores.  According to Defendant, this logic would allow a handful of companies to block any potential competitors from entering the marketplace.

"Dissimilarities between the retail outlets for and the predominant consumers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or

deception." *Pebble Beach Company v. Tour 18 I, Ltd.*, 942 F.Supp. 1513, 1545 (S.D.Tex. 1996) (citing *Exxon*, 628 F.2d at 505). However, if the parties' goods and services are offered at the same level of distribution and at the same type of facilities, there is a greater likelihood of confusion. *Id.* (citing *Louisiana World Exposition, Inc. v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984)). On the other hand, the fact that the same exact stores do not carry both parties' merchandise enhances the likelihood of confusion. *Louisiana World Exposition, Inc.*, 746 F.2d 1033 at 1041. "The inability to compare the products side by side ... may increase the likelihood of confusion." *Id.* (quoting *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.*, 656 F.2d 186, 192 (5th Cir. 1981)).

Plaintiff produces evidence proving that the parties' products are sold in similar, if not identical, channels and that the products are ultimately targeted at similar consumers. The Court agrees with Plaintiff that Defendant's assertions that the parties have different customers is contrary to the record. Shum did provide testimony indicating that the parties have, or have had, overlapping customers, and he testified that his largest customers are grocery stores. Gelb's affidavit indicates that both parties sell to outlets frequented by overlapping consumers, such as Wal-Mart and the Dollar Store.[5] The inability of these consumers to make in-store comparisons between the two brands increases the likelihood of confusion. This digit weighs in favor of a finding of infringement.

---

[5] Defendant has attached Frank's affidavit to its Response. While Defendant does not mention Frank's report in its briefing on this digit, Frank characterizes Gelb's testimony about the similarity of Wal-Mart and dollar store customers as "unfounded." (*Id.* at ¶ 3.) Frank argues that the buyers for the respective retail outlets are sophisticated actors and that their purchasing decisions are not impulse buys. (*Id.* at ¶ 4.) Frank's affidavit does not directly address the sophistication of the consumers who will ultimately purchase the parties' products from various retail outlets, and he offers no reason for his view that Gelb's conclusions are unfounded.

### 5.  Advertising Media Identity

Neither party advertises through broad-based methods.  Plaintiff uses cooperative advertising pools, trade shows, and sales representatives, retail distributors, while Defendant limits its advertising to its website, its store, personal relationships with retailers, and, prior to 2004, trade shows.   Plaintiff argues that the companies' promotional efforts are not "significantly different." Defendant responds that it does not do a great deal of advertising on its website, it does not use cooperative advertising pools, and that it stopped attending trade shows in 2004.

Generally, "the greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." *American Century Proprietary Holdings, Inc. v. American Century Casualty Company*, 295 Fed.Appx. 630, 637 (5th Cir. 2008) (not designated for publication) (citing *Quantum Fitness Corp.,* 83 F.Supp.2d at 827).  It is true that, to the extent the parties advertise their products, they both maintain websites and use personal relationships.   According to the record, however, Plaintiff invests a great deal of money in trade shows and cooperative advertising pools, methods Defendants do not use.   The Court therefore considers this factor to be neutral, or, considering all the factors in the light most favorable to Defendant, indicating a low possibility of confusion.

### 6.  Defendant's Intent

Neither party has offered any evidence indicating that Defendant intended to infringe on Plaintiff's trademark rights.   Shum testified that he had never heard of Plaintiff, or its use of Homax, until this lawsuit was filed.  This factor is neutral.

### 7.  Actual Confusion

Neither party has introduced any evidence indicating that consumers are actually confused by the two brands.  This factor is therefore neutral.

### 8.  Care Exercised by Potential Purchasers

Finally, the Court considers how much care potential purchasers will exercise when purchasing the parties' products.  "Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Xtreme Lashes*, 2009 WL 2033150 at *6 (citing *Smack Apparel*, 550 F.3d at 483). Conversely, "the more sophisticated the consumers, the less likely they are to be misled by similarity in marks."  *TCPIP Holding Co. v. Haar Communs., Inc.*, 244 F.3d 88, 102 (2d Cir. 2001).   Plaintiff asserts that, because the products sold by both parties are relatively inexpensive, consumers will not do a great deal of research before purchasing them. Defendant responds that, since its customers are retailers buying in bulk instead of individual customers buying for personal consumption, they are more sophisticated than Plaintiff assumes.  Defendant also asserts that Plaintiff's customers are involved in "do-it-yourself" home repair and therefore more discriminating purchasers.

Neither party offers evidence to support its assertions.  Taking all inferences in favor of Defendant, however, the Court believes that there is a fact issue as to whether this digit indicates a likelihood of confusion.

### D.  Overall Likelihood of Confusion

Of the eight digits, the Court finds that three indicate a likelihood of confusion: the type of mark, the similarity of the products, and the similarity of the outlets.  There are fact issues as to the marks' similarity, overlapping advertising channels, and

consumer sophistication. Two factors—defendant's intent and actual consumer confusion—are neutral.

If the likelihood of confusion analysis is closely balanced, the court should resolve the question in favor of the senior user. *American Century Proprietary Holdings, Inc. v. American Century Casualty Company*, 295 Fed. Appx. at 638 (citing *Quantum*, 83 F.Supp.2d at 830-831). Given the strength of Plaintiff's mark, the similarity in the parties' products, and their similar outlet and purchaser identities, the Court concludes that Defendant's use of Homax is likely to lead to consumer confusion.

## III.    CONCLUSION

For these reasons, Plaintiff's Motion for Summary Judgment is **GRANTED**. Plaintiff's Opposed Motion for Partial Summary Judgment is **DENIED** as moot.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the ____ day of August, 2009.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT.**